**FRANK PORTER, NANCY PORTER and
CENTRAL CADILLAC COMPANY, Plaintiffs**
**v.**
**ELLA SAMUEL, GLORIA P. SAMUEL,
ARISTIDE V. SAMUEL, MARVA SAMUEL
APPLEWHITE, UNITED STATES DEPARTMENT
OF THE INTERIOR, NATIONAL PARK SERVICE,**
and all others claiming an interest in
**PARCELS 3A-1, 3A-1-1, 3A-1-2, 3A-1-3,
3A-1-4, 3A-1-5, and/or 3A/s
ESTATE ZOOTENVAAL, Defendants**

**UNITED STATES DEPARTMENT OF THE INTERIOR,
NATIONAL PARK SERVICE, Cross-Plaintiff**
**v.**
**ELLA SAMUEL, GLORIA P. SAMUEL,
ARISTIDE V. SAMUEL, MARVA SAMUEL
APPLEWHITE, Cross-Defendants**

Civ. No. 1993-0030

District Court of the Virgin Islands

Div. of St. Thomas and St. John

April 19,1995

Maria T. Hodge, Esq., (Hodge & Francois), St. Thomas, V.I., *for Plaintiffs*

Clarence Taylor, Esq., (Office of the United States Attorney), St. Thomas, V.I., *for Cross-Plaintiffs*

Bernard VanSluytman, Esq., St. Thomas, V.I., *for Cross-Defendants*

MOORE, *Chief Judge*

### MEMORANDUM

This matter came on for hearing on February 24, 1995, on the motion of the United States Department of the Interior, National Park Service ("United States") for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. At issue in this case are 10.7 acres of land on the east end of St. John over which the United States and cross-defendants Ella Samuel, Gloria P. Samuel, Aristide V. Samuel and Marva Samuel Applewhite ("the Samuels") claim an ownership interest. Because the statute of limitations governing the Samuels' claim has run, the Court granted the

United States' motion for summary judgment at oral argument.[1] This Memorandum supplements the Court's earlier ruling from the bench at the end of the hearing.

## FACTS AND PROCEDURAL HISTORY

After a series of purchases spanning twelve years and culminating in 1922, Alfred H. Lockhart owned two adjoining tracts of land on St. John: Estate Hermitage to the east and Estate Zootenvaal[2] in the west. Although these two estates were once separately owned and had distinct boundaries, Lockhart merged Estates Hermitage and Zootenvaal and held them uninterrupted, without severance or reconfiguration, for thirty years. In 1950, Lockhart hired Nathaniel Wells to survey his extensive land holdings on St. John. Wells produced survey map P.W.D. D9-24-T51, which was filed with the Department of Public Works in 1951 although it is dated October 26, 1950 ("1950 Survey Map"). *See* 1950 Survey Map attached as Illustration 1.[3]

While the 1950 Survey Map retained the Danish estate names and conformed to the Danish estate boundaries in many respects, Wells created a new boundary between Estates Hermitage and Zootenvaal west of the old Danish line and included approximately 10.7 acres in Estate Hermitage that had previously been a part of Estate Zootenvaal.[4] The 1950 Survey Map indicated that the resulting configuration of Estates Hermitage and Zootenvaal measured 80 acres and 70 acres respectively, while Estate Zootenvaal and Estate Hermitage continued to share the same, but newly designated, boundary line.

---

[1] Our decision to grant the United States' summary judgment motion moots the Samuels' pending motion to dismiss plaintiffs claims for lack of standing.

[2] Some of the materials of record in this case spell Zootenvaal with one "a."

[3] Because the legend in the lower left hand corner of the Map is illegible, it may be useful to reproduce that information here. The legend shows that Nathaniel O. Wells (denoted by the initials "N.O.W.") was in charge of the survey; the survey map was traced by Floyd C. George, Jr.; the scale of the map is 1:10000; the map was dated October 26, 1950, even though the "T51" indicates it was filed with Public Works in 1951.

[4] The old Danish boundary between Estates Hermitage and Zootenvaal was denoted by a historic fence line. *See* United States Department of the Interior, National Park Service Boundary Survey of Estates Hermitage and Zootenvaal, attached hereto as Illustration 2. This survey is provided for illustrative purposes only and has not been adopted by the Court as a definitive indication of all of the parties' interests in the land depicted.

In April 1952, the Herbert E. Lockhart estate, A.H. Lockhart's successor in interest, sold Parcel Nos. 3A and 3D Estate Zootenvaal to James Samuel by warranty deed. Warranty Deed of April 5, 1952, recorded in the Office of Recorder of Deeds for St. Thomas and St. John on May 29, 1952 at Book 4E, p. 142, Sub. No. 141. The warranty deed specifically referred to Wells' 1950 Survey Map which "more particularly described" the conveyed property. After James Samuels' death in December 1952, this Court, sitting in probate, awarded Parcel No. 3A Estate Zootenvaal to Ella Samuel, James Samuel's widow in a decree which clearly indicated that Parcel No. 3A Estate Zootenvaal measured 70 acres.[5] *In re Estate of James Harry Samuel,* Prob. No. 5-1953 (D.V.I. February 13, 1954) (order adjudicating James Samuel's estate).

In 1955, meanwhile, the H.E. Lockhart Development Corporation, A.H. Lockhart's successor in interest (sometimes "Lockhart"), sold Estate Hermitage to Jackson Hole Preserve, Inc. ("Jackson Hole") in a deed describing Estate Hermitage as comprising 80 acres and incorporating the 1950 Survey Map by reference. Warranty Deed of Jan. 27, 1955, recorded in the Office of the Recorder of Deeds for St. Thomas and St. John on Feb. 28, 1955, at Book 4H, p. 123, Sub. No. 161. A copy of the 1950 Survey Map was attached to this conveyance. On November 21, 1956, Jackson Hole conveyed Estate Hermitage to the United States by deed of gift which refers extensively to the 1950 Survey Map. Gift Deed of Nov. 21, 1956, recorded in the Office of the Recorder of Deeds for St. Thomas and St. John on Dec. 18, 1956, at Book 4K, p. 443, Sub. No. 1064.

In 1964, eight years after the United States acquired Estate Hermitage, Ella Samuel subdivided No. 3A Estate Zootenvaal into two tracts by carving out Parcel No. 3A-1 Estate Zootenvaal, 25 acres of land, the extreme eastern border of which shared a common boundary with Estate Hermitage per the 1950 Survey

---

[5] The Court awarded Estate Zootenvaal 3D (also known as Rehoboth) to Gloria, Aristede, and Marva Samuel, James Samuel's children and defendants in this action. The probate decree listed Zootenvaal 3D as measuring 9 acres, an inconsistency with the 1952 Warranty Deed between the Lockhart family and James Samuel, which is not relevant to this case.

Map.[6] This subdivision was evidenced by a new survey map, P.W.D. G9-800-T64, dated December 28, 1964 by Nathaniel Wells ("1964 Survey Map"), in which Wells incorporated the boundary line between Estate Hermitage and Parcel No. 3A-1 Estate Zootenvaal which he had earlier established on his 1950 Survey Map. *See* 1964 Survey Map Attached as Illustration 3.

On January 20, 1965, Ella Samuel conveyed Parcel No. 3A-1 Estate Zootenvaal to Edwin and Elaine Limbert by warranty deed to which a copy of the 1964 Survey Map was attached. Warranty Deed of Jan. 20, 1965, recorded in the Office of the Recorder of Deeds for St. Thomas and St. John on Feb. 1, 1965, at Book 7P, p. 46, Sub. No. 513. The plaintiffs are successors in interest to the Limberts and presently own all of what was once Parcel 3A-1, Estate Zootenvaal.[7] In 1981 Ella Samuel deeded Parcel No. 3A Estate Zootenvaal to her children Gloria P. Samuel, Aristide V. Samuel and Marva Samuel Applewhite, defendants in this case. However, the deed of gift did not contain any written description of the property nor did it contain a reference to any map. Gift Deed of April 8, 1981, recorded in the Office of the Recorder of Deeds for St. Thomas and St. John on June 4, 1981, at Book 22-M, p. 153, Sub No. 1947.

At the time of this lawsuit, then, the recorded ownership of Estates Hermitage and Zootenvaal was as follows: a) the United States held title to all 80 acres of Estate Hermitage, as part of the V.I. National Park; b) plaintiffs owned 25 acres in what had been Parcel No. 3A-1 Estate Zootenvaal, consisting of six parcels: Nos. 3A-1, 3A-1-1, 3A-1-2, 3A-1-3, 3A-1-4, and 3A-1-5; and c) the Samuels owned No. 3A Estate Zootenvaal, measuring approximately 45 acres. *See* Illustration 2.

Sometime in 1988 the Samuels hired Marvin Berning to survey and subdivide Estate Zootenvaal 3A. Based on his field measure-

---

[6] The remaining land to the south and west, consisting of approximately 45 acres, continued to be called No. 3A Estate Zootenvaal (in reality No. 3A Estate Zootenvaal Remainder).

[7] In 1972 the Limberts subdivided Estate Zootenvaal 3A-1 into six parcels: Parcels No. 3A-1, 3A-1-1, 3A-1-2, 3A-1-3, 3A-1-4, and 3A-1-5 Estate Zootenvaal, as depicted on P.W.D. Map Nos. C9-139-T72 and D9-1073-T72. Later that same year, the Limberts sold all six parcels to plaintiffs Frank and Nancy Porter and the Central Cadillac Company.

ments and an oral history related by Willis Samuel,[8] Berning concluded that the Samuels owned a "lost" parcel of Estate Zootenvaal measuring 10.7 acres, since Wells' 1950 Survey Map "improperly" extended Estate Hermitage's borders 10.7 acres west of the old Danish boundary. In December 1991, Berning filed O.L.G. Map No. D9-5225-T92 ("Berning's 1991 Survey Map") which placed this "newly discovered" 10.7 acres, referred to as Parcel No. 3A-2 Estate Zootenvaal, inside the V.I. National Park along Estate Hermitage's extreme western boundary. Thus, Berning's 1991 Survey Map would reduce Estate Hermitage by 10.7 acres and insert Parcel No. 3A-2 Estate Zootenvaal between plaintiffs' property and the V.I. National Park. *See*Illustration 2. The Samuels now contend that since A.H. Lockhart conveyed all of Estate Zootenvaal to their father James Samuel, this "lost" 10.7 acres was included in that conveyance.

Plaintiffs brought this action for trespass and to quiet title pursuant to the Quiet Title Act of 1972, 28 U.S.C. § 2509(a) ("Quiet Title Act"), the Virgin Islands Declaratory Judgment Act, V.I. CODE ANN. tit. 5, §§ 1261-1272 (1967), and the local quiet title statute, 28 V.I.C. § 372.[9] Plaintiffs argue that because they bargained for a site adjacent to the V.I. National Park, Berning's 1991 Survey Map, if accepted, would substantially devalue their property by inserting an "interloper" parcel along their eastern boundary.[10] The United States, after answering, filed a counterclaim against plaintiffs and a cross-claim against the Samuels challenging the existence of the "lost" parcel and reasserting its ownership of the 10.7 acres in dispute. The Samuels also claimed ownership of the "lost" parcel, No. 3A-2 Estate Zootenvaal, in their counterclaim to plaintiffs' complaint and in their answer to the United States' cross-claim. The United States moved for summary judgment shortly thereafter.

---

[8]Willis Samuel is the son of James Samuel and his first wife Lillian Samuel.

[9]Even though plaintiffs have sued under the V.I. Declaratory Judgment Act and the local quiet title statute, it is axiomatic that these statutes cannot confer jurisdiction over the United States. Only Congress can waive the sovereign immunity of the United States. *United States v. Dalm*, 494 U.S. 596, 610 (1990).

[10]Although plaintiffs at first contended that they owned the "lost" parcel designated as No. 3A-2 Estate Zootenvaal, they have since withdrawn that claim.

The sole question presented by the United States' motion for summary judgment is whether the Quiet Title Act's twelve-year statute of limitations has run on the Samuels' claim to No. 3A-2 Estate Zootenvaal. For the reasons articulated below, we conclude that it has.

## DISCUSSION[11]

Summary judgment is a drastic remedy. A court may grant a motion for summary judgment pursuant to FED. R. CIV. P. 56 only when the materials of record show that there is no genuine issue about any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Clint Aero, Inc. v. Ground Services, Inc.*, 25 V.I. 446, 448, 754 F. Supp. 57, 58 (D.V.I. 1990). A "material" fact is one that will affect the outcome of the suit under applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 247-48. *Ferris v. V.I. Industrial Gases, Inc.*, 23 V.I. 183, 188 (D.V.I. 1987).

The moving party bears the initial burden of showing that no genuine issue of material fact exists. But once the movant properly supports a motion for summary judgment, the nonmoving party "may not rest upon the mere allegations or denial of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 248. Any

---

[11] This Court is under an "unflagging duty to ensure that it has jurisdiction over the subject matter of the cases it proposes to adjudicate." *American Policyholders Ins. Co. v. Nyacol Prod., Inc.*, 989 F.2d 1256, 1258 (1st Cir. 1993), *cert. denied*, 114 S. Ct. 682 (1994). Even though none of the parties have challenged our jurisdiction, we address whether the District Court of the Virgin Islands can hear claims under the Quiet Title Act, 28 U.S.C. § 2409a. Pre-1984 precedent has held that this Court is not a district court within the meaning of certain federal statutes. *See, e.g., Ali v. Gibson*, 572 F.2d 971, 974 (3d Cir. 1978) (holding that the District Court of the Virgin Islands is not a district court within meaning of 28 U.S.C. § 2241). In 1984, Congress amended the Revised Organic Act, ch. 558, 68 Stat. 497 (1954), *amended by* Pub. L. No. 98-454 (1984), (codified as amended at 48 U.S.C. §§ 1541-1645) ("Revised Organic Act"), to clarify the jurisdiction of this Court. Section 22(a) now reads: "The District Court of the Virgin Islands shall have the jurisdiction of a district court of the United States . . . ." Revised Organic Act § 22, 48 U.S.C. § 1612(a). As a consequence, this Court may adjudicate those cases over which Congress has vested jurisdiction in a district court of the United States. Since Congress vested "district courts" with exclusive, original jurisdiction over Quiet Title Act suits, 28 U.S.C. § 1346(f), this Court may properly entertain such claims.

doubts are resolved in favor of the nonmoving party whose allegations are taken to be true. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983), *cert. denied*, 465 U.S. 1092 (1984).

■ The Quiet Title Act provides:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. 2409a(g). Compliance with this limitation provision is a jurisdictional prerequisite to quiet title suits against the United States. *Block v. North Dakota*, 461 U.S. 273, 282 (1983); *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir. 1991), *cert. denied*, 112 S.Ct. 1667 (1992). Moreover, because the Quiet Title Act represents a limited waiver of the sovereign immunity of the United States, it must be strictly construed in favor of the United States. *Shultz v. Department of Army*, 886 F.2d 1157, 1159 (9th Cir. 1989). The Quiet Title Act's twelve-year period of limitations starts to run on the date that the claimant, or the claimant's predecessor in interest, knew or should have known of the United States' claim to the property. *Brown v. United States*, 496 F. Supp. 903 (D.N.J. 1980). The language "should have known" imparts a test of reasonableness. All that is required is a reasonable awareness that the government claims some interest adverse to the claimant. *Vincent Murphy Chevrolet Co., Inc. v. United States*, 766 F.2d 449, 452 (10th Cir. 1985); *D.C. Transit System, Inc. v. United States*, 531 F. Supp. 808, 811 (D.D.C. 1982), *aff'd*, 790 F.2d 964 (D.C. Cir. 1983).

■ Although the Quiet Title Act must be construed according to federal law, courts may look to state law as an aid in determining the application of statutory language to specific facts. *Amoco Production Co. v. United States*, 619 F.2d 1383, 1387 (10th Cir. 1980). In determining when the Samuels or their predecessors in interest knew or should have known of the United States' claim to Parcel No. 3A-2 Estate Zootenvaal, therefore, we look to the Virgin

Islands law of actual and implied notice. *See id.; D.C. Transit System, Inc.* 531 F. Supp. at 812. Under Virgin Islands law, notice may be express or implied. "It is express when it consists of knowledge actually delivered into the hands of a person; notice may be implied when it consists of knowledge of facts so informative that would cause a reasonably cautious person to be led by them to the ultimate fact." *Bennerson v. Small,* 23 V.I. 113, 116 (D.V.I. App. 1987). Implied notice places a duty of inquiry on property owners. *Id.* They are charged with constructive notice of all that a reasonable inquiry would have disclosed.

> Purchasers of real estate are affected not only by matter of which they have actual knowledge and by what appears of record but also "by what they could have learned by inquiry of the person in possession and of others who, they had reason to believe, knew of facts which might affect the title."

*Machover v. Abdallah,* 329 F.2d 800, 802 (3d Cir. 1964) (citation omitted). Virgin Islands case law also establishes that the recording of a legal instrument gives constructive notice to all subsequent purchasers of the recorder's interest in or claim to the property. *See Bachman v. Hecht,* 659 F. Supp. 308, 315 (D.V.I. 1986), *aff'd* 849 F.2d 599 (3d Cir. 1988); *see, e.g.,* 29 V.I.C. § 92(j) (Supp. 1994).

▆▆▆ The undisputed facts of this case indicate that Ella Samuel, the Samuels' predecessor in interest, should have known of the United States' claim to what Berning's survey labeled as Parcel No. 3A-2 Estate Zootenvaal as early as 1956 when the United States recorded its deed to Estate Hermitage, which clearly incorporates the area encompassed by this "lost parcel." Also, the facts demonstrate that Ella Samuel had actual notice of the United States' claim to the area of land encompassing what Berning has labeled "No. 3A-2 Estate Zootenvaal" when she executed a warranty deed in 1965 conveying No. 3A-1 Estate Zootenvaal to the Limberts, since the deed she signed contained a written description of the property that placed its entire eastern boundary in common with Estate Hermitage's western border. The description of No. 3A-1 Estate Zootenvaal reads:

> Beginning at the *northwestern corner of Estate Hermitage* the line runs in a general westerly direction a distance of CA 1100 feet

along Estate Browns Bay to a bound post; thence turning and running South 42 degrees 00 minutes East, a distance of 1728.0 feet, more or less, along Estate Zootenvaal to a bound post; thence in the same direction a distance of CA 75 feet along Estate Zootenvaal to a point; thence turning and running in a general northeasterly direction a distance of CA 890 feet along Borck Creek to a point; thence turning and running North 42 degrees 00 minutes West, a distance of CA 80 feet *along Estate Hermitage* to a bound post; thence in the same direction a distance of 1012.6 feet, more or less, *along Estate Hermitage to the point of beginning.*

Warranty Deed of January 20, 1965 (emphasis added). This description of the common boundary between Estates Hermitage and Zootenvaal corresponds to the boundary portrayed on the 1964 Survey Map, which, in turn, mirrored the boundary established on Wells' 1950 Survey Map. Furthermore, this boundary description is entirely consistent with the recorded deeds conveying Estate Hermitage, first to Jackson Hole in 1955, and then to the United States in 1956. Both of these deeds incorporated the 1950 Survey Map by reference. Thus, the border between Estates Hermitage and Zootenvaal described in Ella Samuel's 1965 deed to the Limberts is the same border established by the 1950 Survey Map, reproduced in the 1964 Survey Map, and included in the 1955 and 1956 deeds conveying Estate Hermitage. All of these documents tied the eastern boundary of Estate Zootenvaal to the western boundary of Estate Hermitage, leaving no room for Berning's "lost parcel," designated as No. 3A-2 Estate Zootenvaal. Instead, the "lost parcel" that Berning describes has rested squarely inside the western boundary of Estate Hermitage since 1950, two years **before** the Samuels' earliest predecessor in interest, their father James Samuel, had any claim to Estate Zootenvaal.

■ At the time that she conveyed No. 3A-1 Estate Zootenvaal to the Limberts in 1965, therefore, Ella Samuel reasonably should have known of the United States' adverse claim to the "lost parcel." Under the Quiet Title Act, Ella Samuel had until 1977 to prosecute her claim against the United States. Because Ella Samuel's knowledge is imputed to her successors in interest, 28

U.S.C. § 2409a(g), and because the Samuels did not properly assert their claims to this "lost parcel" of Estate Zootenvaal until May 1993, the Samuels' claim to Estate Zootenvaal 3A-2 is time barred. There is simply no issue of fact, let alone a genuine issue of material fact, in this regard.

■ The Samuels place emphasis on being nominal defendants in this case and the imposition by the Quiet Title Act of a limitations period only on "plaintiffs." *See* 28 U.S.C. § 2409(a)(g). This emphasis is misplaced. As other courts have held, jurisdiction under the Quiet Title Act is not dependent on the technical alignment of the parties. *See Key v. Wise*, 629 F.2d 1049, 1057 (5th Cir. 1980), *reh'g denied*, 645 F.2d 72 (5th Cir.), *cert. denied*, 454 U.S. 1103 (1981). Its twelve-year statute of limitations applies to all parties challenging the United States' title to land, regardless of how they are lined up as parties in a particular lawsuit. To hold otherwise would frustrate the essential purpose of quiet title suits generally and that of the Quiet Title Act in particular. The principal purpose of Quiet Title Act suits is to conclusively settle all doubts about title to land in which the United States claims an interest. Finality is an overriding goal. Toward this end, the quiet title plaintiff must bring suit against anyone claiming an interest in the property; hence, by their very nature, quiet title suits commonly involve counterclaims and cross-claims by the various parties. This is especially true in quiet title suits against the United States because the Quite Title Act is the exclusive method of challenging the United States' interest in land, and the principles of *res judicata* may act as a bar in any subsequent litigation. *Block v. North Dakota*, 461 U.S. at 286.

■ Therefore, even though the Quiet Title Act does not specifically provide for counterclaims or cross-claims, this Court, as well as other courts, has permitted the parties to assert claims against each other regardless of their alignment. *See United States v. Penn*, 632 F. Supp. 691, 693 (D.V.I. 1986); *United States v. Drinkwater*, 434 F. Supp. 457, 460 (D. Va. 1977). In fact, the Samuels have filed a counterclaim of their own against plaintiffs. And, in the quiet title context, we would be justified in treating the Samuels' affirmative defense to the United States' cross-claim as another counterclaim. *See Alexander Hamilton Life Ins. Co. v. Government of Virgin Islands*,

757 F.2d 534, 541 (3d Cir. 1985) (treating affirmative defense of ownership as a counterclaim in quiet title action). In this case, the Samuels have challenged the United States' claim to the disputed property. As such, they stand in the shoes of any plaintiff seeking to quiet title against the United States.

Accordingly, the motion of the United States for summary judgment is hereby granted. A separate order follows.

DATED this 19th day of April, 1995.

## ORDER

Upon consideration of the premises, the Court being duly advised, and for the reasons set forth in the Court's Memorandum of even date, it is hereby

ORDERED that the motion for summary judgment of the United States Department of the Interior, National Park Service is GRANTED.

DATED this 19th day of April, 1995.

ILLUSTRATION 1