**Mousa I. DABABNAH, M.D., Plaintiff,**

v.

**WEST VIRGINIA BOARD OF MEDICINE, et al., Defendants.**

**No. Civ.A. 5:98–0639.**

United States District Court,
S.D. West Virginia.

May 11, 1999.

---

Mouse I. Dababnah, Beaver, WV, John C. Yoder, Harpers Ferry, WV, for Mousa I. Dababnah, M.D., for plaintiff.

Eric A. Collins, Pullin, Knopf, Fowler & Flanagan, Beckley, WV, David F. Nelson, Schumacher, Francis, Stennett & Nelson, Charleston, WV, R. Ford Francis, Ford Francis R., Schumacher, Francis, Stennett & Nelson, Charleston, WV, Geoffry A. Haddad, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, Gerard R. Stowers, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, Geoffry A. Haddad, Gerard R. Stowers, Ancil G. Ramey, Steptoe & Johnson, Charleston, WV, John M. Hedges, Byrne & Hedges, Morgantown, WV, for defendant.

Geoffry A. Haddad, Bowles, Rice, McDavid, Graff & Love, Charleston, WV, Gerard R. Stowers, Gunnoe, Gunnoe,Mousa I. Dababnah, Beaver, WV, counter-defendant.

## MEMORANDUM OPINION

FABER, District Judge.

Before this court is the extraordinary case of Dr. Mousa I. Dababnah.[1] The genesis of this case is the acrimonious divorce and child support proceedings that began in the Circuit Court of Raleigh County, West Virginia ("circuit court"), on December 22, 1993. *See Dababnah v. Dababnah,* Civ. No. 93–D–1224–B, Cir.Ct. Raleigh Co., W.Va. That action remains pending and there is now this and one other related lawsuit ongoing in federal court. *See Dababnah v. Keller–Burnside,* Civ. No. 5:97–1144. In addition, one earlier related lawsuit in this court was dismissed. *See Dababnah v. Byron,* Civ. No. 5:97–0624 (S.D.W.Va.1997). The instant case involves twenty-four (24) defendants, fifteen (15) counts, and raises a number of serious constitutional questions, including the important and difficult question of the balance between the powers of Congress and rights of the States.

One defendant, the Honorable Robert A. Burnside is the judge presiding over the domestic relations case in state circuit court. The plaintiff claims that Judge Burnside conspired to prevent plaintiff from participating as a party in a federal lawsuit and otherwise violated his constitutional rights, and he seeks a declaratory judgment. Now before this court is Judge Burnside's motion to dismiss for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine, that the court should abstain from hearing the claim under the *Younger* abstention doctrine, that plaintiff fails to state a claim under 42 U.S.C. § 1985(2), and that this court should exercise its discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201, and decline to hear plaintiff's case.

For the reasons stated below, the court **DENIES** Judge Burnside's motions to dis-

---

1. The court notes at the outset that many of the disturbing allegations on which much of this opinion is based are just that—allegations. They have not been established as true, but, in certain respects, are taken as true for purposes of this decision, as the rules of procedure require.

miss without prejudice to renew the motions or to move for summary judgment upon fuller development of the factual record.

## I.

### A. Background

The factual background of this case is voluminous. Therefore, the court recites a condensed version of Dr. Dababnah's factual allegations as they relate to the claims against Judge Burnside.

Dr. Dababnah was licensed to practice medicine in the State of West Virginia on January 13, 1976. He has practiced medicine since that time without any ethical complaints. His practice was interrupted for the first time on July 1, 1998, when the West Virginia Board of Medicine ("Board") refused to renew his medical license. The reasons given by the Board for not renewing Dr. Dababnah's license were that Dr. Dababnah failed to fully answer the questions on the renewal application and that he was in arrears in child support by an amount equivalent to or greater than six months of payments.[2] Dr. Dababnah filed this case following the Board's non-renewal of his license. The events leading up to the Board's refusal to renew Dr. Dababnah's license are remarkable and, if Dr. Dababnah is to be believed, represent a conspiracy by some of the defendants to deprive Dr. Dababnah of his livelihood and constitutional rights:

While Dr. Dababnah's divorce case was ongoing in Judge Burnside's court, an incident allegedly took place wherein Dr. Dababnah intentionally damaged or destroyed a vehicle being used by his wife, Sharan B. Dababnah. Dr. Dababnah was convicted in the magistrate court of Raleigh County and sentenced to a five-day term of imprisonment. He appealed this conviction but did not appear at the trial de novo in circuit court. Dababnah claims

neither he nor his attorney were notified of the December 1, 1995 trial date.

During November and December of 1995, Dr. Dababnah was not in West Virginia. Rather, he was in the Commonwealth of Virginia communicating with public officials in West Virginia regarding alleged corrupt activities in Raleigh County Circuit Court. Dr. Dababnah claims that once his trial date of which he was unaware passed, the chief assistant prosecuting attorney for Raleigh County, Kristen Keller–Burnside, who is married to Judge Burnside, sought his arrest and extradition from Virginia on the misdemeanor in an attempt to silence his complaints about corruption in the court system. Dr. Dababnah was arrested by the Virginia State Police on December 5, 1995. Subsequently, property of Dr. Dababnah was seized by West Virginia state troopers from his Virginia hotel room without a warrant.

On information received from West Virginia, Virginia authorities incorrectly informed Dr. Dababnah that he had been arrested for a felony charge. Dr. Dababnah thereafter waived extradition and appeared before Judge H.L. Kirkpatrick, III, in Raleigh County, West Virginia. Prior to the hearing, Keller–Burnside allegedly incorrectly informed Dr. Dababnah that his attorney, Rebecca Bell, had withdrawn from representing him. In light of this, Dr. Dababnah waived his right to counsel. At the hearing, Judge Kirkpatrick credited Dr. Dababnah with the time spent in jail in Virginia and ordered him to serve the remainder of his sentence. At the hearing before Judge Kirkpatrick, prosecutor Keller–Burnside requested and received an order authorizing the Virginia or West Virginia State Police to enter the hotel room and seize Dr. Dababnah's property. Whether or not Judge Kirkpatrick knew it, and the transcript suggests that he did not, Keller–Burnside was asking for an order authorizing what had already oc-

---

**2.** On February 19, 1999, this court entered a preliminary injunction against the Board prohibiting it from rejecting a renewal applica-

tion from Dr. Dababnah based upon any of the matters at issue in this case. *See* (Prelim.Inj.Order.)

curred. Judge Kirkpatrick also ordered Dr. Dababnah held so that he could appear before Judge Burnside pursuant to a contempt order in the divorce action. It appears, but is non clear from the record, that Dr. Dababnah then spent either seventy-three (73) or 112 days in jail for contempt for failing to abide by Judge Burnside's child support payment and arrearage order.

From April 18, 1994, to the present, the husband of Keller–Burnside, Judge Robert A. Burnside, has presided over Dr. Dababnah's divorce, marital property settlement and child support actions. During the Fall of 1995, the same period in which the events described above took place, plaintiff claims that his attorney, Rebecca Bell, overheard a conversation in which she learned than Judge Burnside and Sharan Dababnah's divorce attorney at the time, C. Elton Byron, Esq.,[3] were planning a vacation together. She reportedly passed this information on to Dr. Dababnah, who then began his campaign of faxing complaints to various officials in the State of West Virginia about corruption in the circuit court of Raleigh County. Plaintiff alleges that his extradition from Virginia was a scheme designed by Keller–Burnside and Byron to get the plaintiff back into West Virginia to face the contempt charge before Judge Burnside and, thus, silence him from complaining to state authorities about the alleged corruption.

Once back in West Virginia, Dr. Dababnah was imprisoned, and, on January 5, 1996, Rebecca Bell withdrew as his attorney for reasons that are not clear from the record, but potentially because of threats from persons in the circuit court. It is also alleged that Judge Burnside imposed Rule 11 sanctions on attorney Bell for her representation of Dr. Dababnah. Then, on February 6, 1996, prosecutor Keller–Burnside moved for appointment of a guardian

ad litem for Dr. Dababnah before Judge Kirkpatrick. Dr. Dababnah had served his time for the misdemeanor charge of malicious destruction of property, for which he was extradited, and was at this time in prison for civil contempt imposed by Judge Burnside for failure to pay child support. Keller–Burnside's interest in having a guardian appointed for plaintiff while he was in jail for civil contempt before her husband is unknown. Kyle Lusk was appointed as guardian and met with Dr. Dababnah. Plaintiff alleges that Mr. Lusk relayed to him that if he would "cooperate" he would be released from jail. Cooperation allegedly meant to cease contacting state officials and criticizing Judge Burnside and others involved with the justice system in Raleigh County for corruption. In addition, if Dababnah failed to cooperate, Lusk allegedly implied that Judge Burnside and prosecutor Keller–Burnside would seek to have Dababnah's medical license revoked. Dr. Dababnah refused to "cooperate" and remained in jail for what may have been 112 days before being released.

After being released from jail in May of 1997, Dr. Dababnah filed his first lawsuit in federal court on June 12, 1997. *See Byron,* Civ. No. 5:97–0624. In this pro se lawsuit, Dababnah named Judge Burnside, prosecutor Keller–Burnside, attorneys for Sharan Dababnah, Byron and Richard M. Gunnoe, Esq., and others as defendants. Dr. Dababnah alleged that the defendants were interfering with his right to petition the government for a redress of grievances. Dr. Dababnah asked for dismissal of his case, which was granted by Order of this court on July 24, 1997, because he felt he could not adequately prosecute the case without counsel.

Subsequently, Dr. Dababnah was able to retain counsel in the person of Mr. Donald

---

**3.** The court notes that Mr. Byron was not named as a defendant in either of the two lawsuits currently pending in this court. Mr. Byron has testified in a deposition that he has never taken a vacation or been on a retreat with either of the Burnsides. *See Keller–Burnside,* Civ. No. 5:97–1144, (Def.'s Mot. Summ.J. Attach. Tr. of Clair Elton Byron, Jr., at 7.)

L. Pitts, Esq., for the domestic relations matter before Judge Burnside. In addition, Dr. Dababnah retained the services of John C. Yoder, Esq., of Harpers Ferry, West Virginia, and J. Thomas Burch, Esq., and William T. Bennett, Esq., from Burch and Cronauer, P.C. of Washington, D.C., to represent him in the second action filed in this court on November 24, 1997, against Keller–Burnside and two state police troopers. *See Keller–Burnside,* Civ. No. 5:97–1144. The same day that plaintiff's attorneys filed the lawsuit in federal court, Mr. Pitts moved Judge Burnside to recuse himself because of a conflict of interest and because he may be called as a material witness in the federal lawsuit. This was the second motion to recuse in the case. *See* (Def. Burnside's Mem.Supp. Mot. Dismiss Ex. A (Chief Justice Workman's Administrative Order of Aug. 29, 1997.).) Judge Burnside denied the motion and forwarded it to Chief Justice Margaret L. Workman of the West Virginia Supreme Court of Appeals.[4] Without a hearing, the chief justice upheld Judge Burnside's decision in an administrative order. *See* (Def. Burnside's Mem.Supp. Mot. Dismiss Ex. B) (Chief Justice Workman's Administrative Order of Dec. 11, 1997.).

On December 4, 1997, Mr. Pitts telephoned Amie L. Johnson, Esq., in the Office of Disciplinary Counsel, seeking advice regarding an ethical dilemma. At this time the motion for recusal was pending before Chief Justice Workman. Mr. Pitts had responded to Chief Justice Workman regarding Judge Burnside's letter that accompanied the motion. Mr. Pitts' response utilized some of the allegations in the case against prosecutor Keller–Burnside pending before this court. Several days after filing his response, Mr. Pitts received "a late evening abusive telephone call at [his] home, from the deputy prosecuting attorney [Keller–Burnside] asking [him] to meet at the office ... the next

day." (Pl.'s Opp'n Mot. Dismiss Gunnoe and Ziegler & Gunnoe Ex. F at Ex. 1.) The prosecutor then called Mr. Pitts at his office the next day inquiring as to his whereabouts and informing his office staff that "we will be waiting for him here." *Id.* Pitts refused to attend the meeting and sought advice from the Office of Disciplinary Counsel as to whether he had been correct. Ms. Johnson advised Mr. Pitts not to meet with the prosecutor without specific permission from his client and client's counsel in the ongoing federal action.

February 18, 1998, was a pivotal day in this case. A motion to modify child support was scheduled for that date before Family Law Master Janet Frye Steele. Pending before the court was Dr. Dababnah's motion, filed by Mr. Pitts, to have Mr. Gunnoe removed as counsel for Sharan Dababnah. Dr. Dababnah alleged, and continues to allege, that Mr. Gunnoe originally represented both parties in what was to be an amicable divorce. Dababnah alleges that he met with Gunnoe on a number of occasions and paid him for his services. Copies of an invoice and a canceled check from Dr. Dababnah dated August 20, 1994, in the amount of $150.00 payable to Richard M. Gunnoe for attorney's fees are contained in the record. Judge Burnside set aside the Family Law Master's hearing in order to hear the motion to remove Mr. Gunnoe, and to hear all other matters in the case "which were taken off track upon the filing of Dr. Dababnah's motion to recuse [Judge Burnside]." (Pl.'s Statement Ex. A (Mem. of Judge Burnside, Feb. 11, 1998.).)

On February 13, 1998, Mr. Pitts had filed a motion to withdraw as counsel alleging that Dr. Dababnah became physically violent with Pitts at a December 18, 1997 meeting. (Def. Burnside's Supp. Mem.Supp.Mot. Dismiss Ex. B.) At the

---

4. Judge Burnside assured Chief Justice Workman in his letter that Dr. Dababnah's case against his wife was "frivolous." Dr. Dabab-nah's claims in that case have survived motions to dismiss and motions for summary judgment.

February 18th hearing, the court denied Pitts' motion to withdraw. Regarding the motion to remove Richard Gunnoe as counsel for Sharan Dababnah, Mr. Pitts claimed that Dr. Dababnah was not someone in whom he would place much reliability regarding representations. *See* (Pl.'s Opp'n Mot. Dismiss Ex. D at 2.) Judge Burnside found that the motion to remove Gunnoe was based on the representations of Dr. Dababnah and was made without sufficient inquiry by Mr. Pitts. Pitts then volunteered information, likely disclosing confidential information, on Dr. Dababnah's conduct in the filing of ethical complaints and federal lawsuits, in which Pitts claimed to have no involvement. Judge Burnside *sua sponte* sanctioned Mr. Pitts under Rule 11 of the West Virginia Rules of Civil Procedure for the motion to remove and ordered him to personally pay $1,600.00 to Gunnoe and his law firm, Ziegler & Gunnoe.

The circuit court also addressed the issue of determining an appropriate child support order. The court found that there were sufficient funds in the plaintiff's Wheat First Union securities account to pay all of the anticipated child support requirements. Judge Burnside concluded that because no other means of enforcement, including imprisonment, proved effective, he would order child support payments and arrearage drawn from the securities account which he had frozen. Judge Burnside ordered Mr. Gunnoe to prepare the order and send it to the court with notice to Mr. Pitts. Pitts would have 20 days to respond.

Dr. Dababnah characterizes Mr. Pitts' conduct at the February 18th hearing as the result of pressure from Judge Burnside. Dababnah claims that Mr. Pitts was being persecuted for representing him and for filing the motion for the recusal of Judge Burnside which included allegations from the federal lawsuit against his wife. Specifically, Dababnah claims that Judge Burnside cut off Pitts' criminal appointments as punishment for representing him.

Dababnah contends that Pitts' comments during the hearing were self-serving to curry favor with Judge Burnside out of fear of retribution.

On March 18, 1998, Mr. Pitts filed yet another motion to withdraw as counsel for Dr. Dababnah. On May 11, 1998, the West Virginia Supreme Court of Appeals for a third time refused to require Judge Burnside to recuse himself. *See* (Def. Burnside's Mem.Supp.Mot. Dismiss Ex. C (Chief Justice Robin J. Davis' Administrative Order of May 11, 1998.).) On May 27, 1998, Judge Burnside issued a memorandum directing Mr. Gunnoe to submit the proposed order regarding the rulings of the February 18th hearing. In a memorandum to attorneys Pitts and Gunnoe dated June 2, 1998, Judge Burnside denied Pitts' motion to withdraw because he failed to show up at the hearing on the motion. Additionally, the court noted that it had still not received the order Mr. Gunnoe was directed to draft and set a deadline of June 12th for its delivery. That deadline was extended to June 19th, but as of June 30th, Judge Burnside still had not received the order.

The significance of this order is that no child support, nor any of the arrearage, was being paid to Sharan Dababnah while the order was pending. During this same period, Dr. Dababnah's medical license was set for renewal. On June 26, 1998, Sharan Dababnah signed an affidavit with the North Carolina Department of Human Resources Child Support Enforcement certifying that Dr. Dababnah was in arrears for payment of child support. The amount of claimed arrearage exceeded six months' worth of child support. This affidavit was then somehow forwarded to the West Virginia Board of Medicine which proceeded to refuse to renew Dr. Dababnah's medical license as of July 1, 1998, under West Virginia Code § 48A–5A–1 *et seq.*, which was passed pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. 104–193, 110 Stat. 2105.

This lawsuit was filed on July 17, 1998. Four days later, five months after the hearing and following the revocation of Dr. Dababnah's license to practice medicine, Judge Burnside received a copy of the proposed order and gave Dr. Dababnah and Mr. Pitts until August 21, 1998, to object. While the Board of Medicine held a hearing and heard an appeal regarding Dr. Dababnah's medical license, both Dr. Dababnah and Mr. Pitts filed objections to Mr. Gunnoe's proposed order.

Mr. Pitts' objections, filed on August 20, 1998, have a tone remarkably different from his conduct at the earlier hearing of February 18th. Eight times Mr. Pitts objected that Judge Burnside's actions were an abuse of judicial authority, arbitrary, capricious and retaliatory against himself and Dr. Dababnah "for (1) vigorously defending his case, (2) for the two (2) federal suits filed by [Dababnah] against Judge Robert Burnside, Richard Gunnoe, Esquire, and Kristen Keller Burnside, ... and the judicial ethics complaint and Motions for Recusal filed against Judge Burnside." (Pl.'s Opp'n Mot. Dismiss Gunnoe and Ziegler & Gunnoe Ex. F.) Pitts argued in his motion that Judge Burnside usurped Dababnah's right to appear before the Family Law Master. Pitts claimed he was sanctioned following the improper contact by the judge's wife, prosecutor Keller–Burnside, and after seeking an ethical determination regarding that contact. Pitts argued that Judge Burnside acted without jurisdiction over certain real property, that the Judge was obsessed with destroying Dr. Dababnah's estate, that his actions were "excessively punitive," in that Judge Burnside was motivated by anger over legal fees he could have to pay in the federal lawsuit pending in this court. *Id.* Interestingly, Mr. Pitts also objected to the court's

finding that Dr. Dababnah had been less than truthful, an issue raised by Pitts in the February 18th hearing. Also, contained in the proposed order drafted by Richard Gunnoe was authorization by Judge Burnside for Sharan Dababnah to seek a criminal contempt prosecution against Dr. Dababnah through his wife, prosecutor Keller–Burnside. Mr. Pitts objected that this was outside of the jurisdiction of the proceeding. On the same date, Dr. Dababnah filed his own similar version of objections to the proposed order in which he argued that the child support arrearage and child support order was incorrect.

While Judge Burnside was considering the objections .to the proposed order, he was also a defendant in this action. On October 28, 1998, this court granted Judge Burnside's motion to dismiss. Dr. Dababnah had sought money damages and injunctive relief under 42 U.S.C. § 1983. This court dismissed those claims because monetary relief is only available against judges when they act outside of their judicial functions, and because plaintiffs are barred from seeking injunctive relief against judicial officers under § 1983 unless the officer is violating a declaratory decree or declaratory relief is unavailable. *See* Federal Courts Improvement Act of 1996, Section 309(c), Pub.L. No. 104–317, 110 Stat. 3847 (codified at 42 U.S.C. § 1983) (FCIA). The court permitted Dr. Dababnah thirty (30) days to refile his complaint to conform to the FCIA, if he so desired. Within that thirty-day window, while he was no longer a defendant but was subject to being reinstated, Judge Burnside ruled on the objections.

Of the numerous objections filed by Dr. Dababnah, Judge Burnside sustained four while rejecting all of Mr. Pitts' objections.[5]

---

**5.** Judge Burnside noted that a number of Mr. Pitts' objections were "personal attacks on the integrity and ethics of the presiding judge. Those attacks have been considered and rejected in two federal actions...." (Pl.'s Statement Ex. J at 5.) As a point of correction, this court never reached the merits of the claim in

the first action which was voluntarily dismissed by Dr. Dababnah and, at the time Judge Burnside made his findings, he had been dismissed from this suit because Dr. Dababnah had sought relief that was unavailable pursuant to the FCIA. This court has not

Plaintiff makes special note of the fact that Judge Burnside denied Mr. Pitts' objection to the award of attorney's fees to Mr. Gunnoe. Plaintiff contends that the award included attorney's fees for work done on the first federal action filed in this court. *See* (*Byron,* Civ. No. 5:97–0624.) This court denied Mr. Gunnoe's request for attorney's fees in that case in its Order of July 24, 1997. Dr. Dababnah claims that the award of fees in his divorce action was a design to "overrule and nullify" this court's order in the dismissed federal case. (Pl.'s Compl. ¶ 207 at 46.) Dr. Dababnah and his attorney Mr. Yoder level the extraordinarily serious charge that:

> defendants Burnside and Gunnoe sent Dr. Dababnah an implied threat that they would also use the divorce proceedings before Judge Burnside to overrule and nullify orders entered by this U.S. District Court in the instant case, and assess attorney's fees against Dr. Dababnah ... notwithstanding any orders to the contrary entered by this U.S. District Court.

*Id.*

Judge Burnside sustained Dr. Dababnah's objections regarding the amount of child support arrearage and the property settlement to which Sharan Dababnah was entitled from the Wheat First Union account. Judge Burnside then directed Mr. Gunnoe to draft another order in conformity with the rulings. On November 23, 1998, Mr. Gunnoe asked for clarification regarding the settlement of the Wheat First Union account. Judge Burnside responded the following day. A few days later plaintiff filed his amended complaint in this court seeking declaratory relief against Judge Burnside pursuant to 42 U.S.C. § 1983. The court is unaware of any other action in the circuit court since the filing of the amended complaint.

### B. Summary of Allegations

Dr. Dababnah paints a villainous picture of the conduct of personnel associated with the judicial system in Raleigh County, West Virginia. In sum, his claim is that a number of individuals conspired to deprive him of his civil rights and access to a legitimate system of justice. The following summarizes Dr. Dababnah's allegations.

An attorney, Mr. Gunnoe, was originally retained by both parties to handle an amicable divorce, but then decided to represent only Dababnah's wife. While his divorce was ongoing in the circuit court, he began to complain about the corruption he believed was rampant there. After being found in contempt by Judge Burnside, Dr. Dababnah fled to Virginia where he continued his campaign of notifying West Virginia authorities of this alleged corruption from a fax machine in a hotel room. In order to silence him, Judge Burnside, prosecutor Keller–Burnside, the wife of the Judge, and Sharan Dababnah's attorney conspired to get Dr. Dababnah extradited from Virginia by claiming he was wanted for a felony rather than a misdemeanor.

Successful in the efforts to return Dr. Dababnah to West Virginia, Keller–Burnside had him appear before the circuit court without counsel, telling him falsely that his counsel had withdrawn. Judge Kirkpatrick placed Dr. Dababnah in custody to serve the remaining three (3) days on his misdemeanor sentence, but ordered him held over to face the contempt charge before Judge Burnside. Judge Burnside then placed Dr. Dababnah in custody for contempt. Dr. Dababnah claims that his attorney, Rebecca Bell, had to withdraw because of threats and sanctions imposed by Judge Burnside. Following this, Keller–Burnside had a guardian appointed for Dr. Dababnah, even though the prosecutor's office had nothing to do with the civil contempt charge in the divorce case before Judge Burnside. Mr. Lusk, the guardian, informed Dr. Dababnah that he had to "cooperate" with the powers at the circuit court or he would remain in jail. "Cooper-

yet considered the merits of plaintiff's claim

in this case.

ate" meant no further complaints against Judge Burnside and Keller–Burnside. Failure to cooperate would mean that they would somehow seek to revoke his medical license.

After eventually being released from prison, Dr. Dababnah filed a federal lawsuit against Judge Burnside, Keller–Burnside and others. He voluntarily dismissed that claim because he did not have counsel. Richard Gunnoe, a defendant in that action and attorney now for Sharan Dababnah, asked this court for attorney's fees. This court declined to grant them.

Dr. Dababnah or his attorney sought the recusal of Judge Burnside from the divorce action on three separate occasions for conflict of interest. All three times Judge Burnside refused to recuse himself and the Chief Justice of the West Virginia Supreme·Court of Appeals concurred.

After Dr. Dababnah filed his second lawsuit in federal court against Judge Burnside's wife, prosecutor Keller–Burnside, she attempted to interfere with the motion to recuse Judge Burnside or otherwise engaged in inappropriate communication by contacting Dr. Dababnah's attorney, Mr. Pitts. Judge Burnside meanwhile decreased Mr. Pitts' criminal appointments as penalty for representing Dr. Dababnah. The judge canceled a family law master's hearing on adjustment of child support to hear pending motions in the divorce action. At that hearing, Judge Burnside sanctioned Mr. Pitts as a punitive measure for his representation of Dr. Dababnah and authorized attorney's fees for Mr. Gunnoe and his firm for having to respond to the motion to remove Mr. Gunnoe over his conflict of interest and for having to respond to the first suit in federal court. This court had already denied Mr. Gunnoe those fees. The implication is that Judge Burnside will use the ongoing divorce proceeding to counteract any favorable rulings for Dr. Dababnah in this court.

Richard Gunnoe was supposed to draft the order reflecting the results of the February 18th hearing. Mr. Gunnoe delayed the order for five (5) months. Judge Burnside sent letters to Mr. Gunnoe asking about the status of the order, but never threatened nor imposed any form of sanction for failing to submit the order. During that five-month period, Dr. Dababnah's medical license came up for renewal. Dr. Dababnah's assets, more than sufficient to pay all of the child support past, present and future, were frozen by the circuit court. In addition, without an order from the circuit court, it was unclear how much child support he owed. Days before Dr. Dababnah's license was set to renew, Sharan Dababnah, Mr. Gunnoe's client, filed an affidavit of arrears which was transmitted to the Board of Medicine. Under a state law mandated by Congress's welfare reform legislation, the Board then declined to renew Dr. Dababnah's license for the first time in his career. By freezing his assets, delaying the order and having Sharan Dababnah file the affidavit, Judge Burnside and Mr. Gunnoe successfully conspired to use a mechanism of a state licensing board to deprive Dr. Dababnah of his livelihood.

Dr. Dababnah then filed this action and, days later, Mr. Gunnoe submitted the order to Judge Burnside. Judge Burnside made rulings on the objections during the thirty-day window this court granted to Dr. Dababnah to amend his complaint against Judge Burnside. Judge Burnside sustained Dr. Dababnah's objections regarding the amount of arrearage and child support, but only after his medical license was taken away for the alleged arrearage. Judge Burnside then directed Mr. Gunnoe to draft the final order. Days later, Judge Burnside was reinstated as a defendant in this action. This court has not been informed as to whether Judge Burnside has ever signed a final order concerning the February 18th hearing.

The allegation is that Judge Burnside has and continues to use his power as the judicial officer in the divorce action to pressure Dr. Dababnah to abandon his

claims in federal court against the judge and his wife, to counteract the actions of this federal court and to punish attorneys who attempt to represent him. Judge Burnside has allegedly done this through adverse rulings, control over Dr. Dababnah's assets, and punitive measures such as fines and imprisonment, in addition to refusing to recuse himself for an obvious conflict of interest.

## II. Motions to Dismiss

Plaintiff has raised claims against Judge Burnside under 42 U.S.C. §§ 1983 & 1985(2). This court has jurisdiction to hear such claims pursuant to 28 U.S.C. §§ 1331, 1343 & 2201. Defendant Burnside filed a motion to dismiss on December 23, 1998, and a supplemental motion to dismiss of February 25, 1999, arguing that this court· does not have jurisdiction to hear this case based on the *Rooker–Feldman* doctrine. The defendant further argued that even if this court does have jurisdiction, it should abstain from exercising such jurisdiction pursuant to the *Younger* abstention doctrine. In addition, defendant contends that plaintiff's claim under 42 U.S.C. § 1985(2) fails to state a claim and that he requests improper relief. Finally, defendant asks that this court exercise its discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201, and decline to entertain plaintiff's claims.

### A. Rooker–Feldman

A motion questioning subject matter jurisdiction must be considered before other challenges because the court must find it has jurisdiction before determining the validity of any claims brought before it. *See Gould, Inc. v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 450 (6th Cir.1988). "It is the duty of the Court to see to it that its jurisdiction is not exceeded." *Spence v. Saunders,* 792 F.Supp. 480, 482 (S.D.W.Va.1992) (citation omitted). Defendant Burnside argues that in *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d

206 (1983), the United States Supreme Court held that district courts are without jurisdiction over the types of claims plaintiff raises against him.

In *Rooker,* the Court noted that, under what is now 28 U.S.C. § 1257, only the Supreme Court had jurisdiction to reverse or modify state court errors on constitutional issues. *See* 263 U.S. at 416, 44 S.Ct. 149. For a district court to entertain such claims would amount to appellate jurisdiction and, therefore, is outside of the statutory jurisdiction of this court. Sixty years later, in *Feldman,* the Court reinforced *Rooker,* noting that district courts are without authority to review final state judicial proceedings. *See* 460 U.S. at 476, 103 S.Ct. 1303. The Chief Judge of this district recently noted that district courts " 'possess no power whatever to sit in direct review of state court decisions,' even if such decisions are alleged to be unconstitutional." *Allstate Ins. Co. v. West Virginia State Bar,* 998 F.Supp. 690, 692 (S.D.W.Va.1998) (quoting *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs,* 398 U.S. 281, 296, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). In *Feldman,* the Supreme Court elaborated on *Atlantic* noting that:

> If the constitutional claims presented to a United States district court are inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's [claim], then the district court is in essence being called upon to review the state-court decision. This the district court may not do.

460 U.S. at 483 n. 16, 103 S.Ct. 1303.

The policy behind this reasoning is the "competence of state courts to adjudicate federal constitutional claims." *Id.* As the United States Court of Appeals for the Fifth Circuit noted, a controlling value behind this policy is "federal-state comity considerations...." *Thomas v. Kadish,* 748 F.2d 276, 281 (5th Cir.1984) (citing *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. 1303). This principle of federal-state comi-

ty is apparent from the text of Article III of the United States Constitution. The Constitution vests federal judicial power in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. With colonial, soon to be state, courts in place, some of the Framers "feared that federal courts would intrude excessively on the states' lawmaking prerogatives." *The Oxford Companion to the Supreme Court of the United States,* 47 (Kermit L. Hall, ed., Oxford University Press 1992). The compromise that formed our present legal system gave Congress the power to create lower federal courts, but did not mandate them. Without subordinate federal courts, state courts were, and to this day remain, this nation's courts of general jurisdiction. As Judge Burnside points out, and federal appellate courts have noted, the *Rooker–Feldman* doctrine is founded on the sound principles of federalism and comity toward state courts. *See Guarino v. Larsen,* 11 F.3d 1151, 1157 (3d Cir.1993); *Facio v. Jones,* 929 F.2d 541, 545 (10th Cir.1991).

Judge Burnside contends that what Dr. Dababnah seeks is a reversal of the recusal decisions by Judge Burnside and the West Virginia Supreme Court of Appeals. Judge Burnside also argues that Dr. Dababnah seeks to attack the judge's rulings by couching his claim in the form of a conspiracy under § 1985(2). Defendant contends that the judicial decisions in the divorce case are "inextricably intertwined" with plaintiff's claims in the instant case. If so, this court is said to be without jurisdiction, and plaintiff's remedy is to be found on appeal to the West Virginia Supreme Court of Appeals and, ultimately, the United States Supreme Court.

The plaintiff has the burden of proving that subject matter jurisdiction exists. *See Richmond, Fredericksburg & Potomac R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir.1999).

Dr. Dababnah contends that either *Rooker–Feldman* does not apply, or that even under the doctrine, this court has jurisdiction. Specifically he argues that: 1) *Rooker–Feldman* does not apply when a state judge uses his power to retaliate against a person who files a claim in federal court; 2) *Rooker–Feldman* does not permit state courts to review and reverse decisions of federal district courts; or, 3) *Rooker–Feldman* does not apply where a state's "rogue" judicial system is not competent to address federal civil rights claims against itself.

*1.*

Citing the right of access to the courts, plaintiff first contends that *Rooker–Feldman* should not apply when a state court judge is retaliating against a party to a case before him for seeking to vindicate rights in federal court. Plaintiff has two cases pending in this federal court. He contends that they present independent claims "not inextricably intertwined with" the divorce proceeding. (Pl.'s Opp'n Mot. Dismiss at 3.)

In the instant case, plaintiff primarily seeks declaratory relief against Judge Burnside for violating his constitutional rights through the use of his office. Without doubt, the right of access to the courts for a fair hearing is paramount to liberty. It is through that access that all other rights are vindicated. The cases plaintiff cites make this abundantly clear. However, the issue before this court is what avenue an aggrieved party must go down to protect this right. Plaintiff contends

that he may seek redress for a state court judge's retaliation by instituting a new action in federal court. Defendant Burnside argues that the appropriate avenue for relief is found on appeal.

Determining whether plaintiff's constitutional claims "are 'inextricably intertwined with' questions ruled upon by a state court, ... depends upon a determination 'that the state court wrongly decided the issues before it.' " *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir.1997) (quoting *Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th Cir.1995)), *cert. denied, Moore v. Cummings*, — U.S. —, 118 S.Ct. 2359, 141 L.Ed.2d 727 (1998). Even though plaintiff does not seek a reversal of any of Judge Burnside's rulings here, to find that the judge interfered with Dr. Dababnah's right of access to the federal courts for vindication of constitutional rights would, at least in part, require this court to make a determination that some of his orders were wrongly decided. The guidance from *Plyler* is clear that this court lacks jurisdiction to sit in such a review. However, the specific allegations plaintiff raises in this argument are relevant to his third contention as discussed below.

## 2.

Plaintiff represents to this court that what is actually taking place in this unfolding situation is a reverse *Rooker–Feldman* problem. Plaintiff claims that Judge Burnside, of the Circuit Court of Raleigh County, West Virginia, is reversing the decisions of this federal court or holding the divorce case hostage in order to use it to counterbalance decisions made here in this and the other pending case. Specifically, plaintiff alleges that Judge Burnside awarded Mr. Gunnoe and his firm attorney's fees after this court denied those same fees in the first case filed here. Plaintiff contends that when *Rooker–Feldman* is turned on its head by a state court judge, the doctrine should not bar a federal court from protecting its decision-making power.

■ Plaintiff does not cite, nor can the court find, any case law directly in support of his novel but interesting theory. However, "[t]he attempt to have a state court reverse or change an otherwise valid federal court judgment is an abuse of the judicial system." *Roberts v. Chevron U.S.A., Inc.*, 117 F.R.D. 581, 586 (M.D.La. 1987). In *Roberts*, the case was removed to the district court, which imposed Rule 11 sanctions for the attorneys' attempt at reversing the ruling in state court. Jurisdiction of the district court was not in question in *Roberts* as it is here.

What plaintiff seeks is an equitable ruling finding that Judge Burnside is not entitled to the protection of *Rooker–Feldman* if he is at the same time violating the principle applied in reverse to state courts. If, in fact, Judge Burnside is engaging in the conduct alleged by the plaintiff, and there are weak circumstantial indications of that, it is more prudent to have this court's rulings and authority protected and vindicated on appeal to the United States Supreme Court, rather than have those actions provide a new basis for the jurisdiction of this court. However, the allegations raised here are relevant to plaintiff's third argument discussed below.

## 3.

Plaintiff asks this court to adopt the reasoning of Chief judge Posner's majority opinion for the United States Court of Appeals for the Seventh Circuit in *Nesses v. Shepard*, 68 F.3d 1003 (7th Cir.1995):

[Plaintiff] cannot show injury from the alleged conspiracy unless the decision ... was erroneous. For suppose that although there was this nefarious conspiracy his suit had no merit and so would have failed even if there had been no conspiracy. Then the conspiracy did him no harm. ... To show harm and thus keep the present suit alive, [plaintiff] would have to show that the decision by the [state] court in his suit ... was erroneous, and that, it may appear, *Rooker–Feldman* bars him from doing. *But the doctrine is not that broad.*

Were [plaintiff] merely claiming that the decision of the state court was incorrect, even that it denied him some constitutional right, the doctrine would indeed bar his claim. But if he claims, as he does, that people involved in the decision violated some independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by the *Rooker–Feldman* doctrine, sue to vindicate that right and show as part of his claim for damages that the violation caused the decision to be adverse to him and thus did him harm. Otherwise there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment. . . .

*Id.* at 1005 (emphasis added) (internal citations omitted). The Seventh Circuit noted that *res judicata* was the more appropriate theory for the facts before it:

[Plaintiff's] mistake was to bring his suit alleging the corruption of the tribunal in the same allegedly corrupt state court system (a mode of proceeding that casts great doubt on the good faith of his claim). He could not expect to win if as we greatly doubt his allegations of corruption are true; and the judgment against him that was rendered in that suit bars his effort to litigate the same claim in federal court.

*Id.* at 1005–06. The instant case presents the opposite situation from *Nesses*. Dr. Dababnah carefully avoided raising his constitutional claims in the state tribunal that he has alleged from the beginning is corrupt. Yet defendant Burnside argues that this is precisely what plaintiff must do rather than seek vindication here. Plaintiff's dilemma is clear: raise claims in an allegedly corrupt state system, lose, and then be barred by res judicata in federal court, or, raise claims initially in federal court and be barred by *Rooker–Feldman.*

The Seventh Circuit's narrow exception to *Rooker–Feldman* is a logical and well-reasoned approach to the problem. As discussed above, the overarching purposes behind the doctrine are the correct functioning of our federal system and respect for state courts. If, in fact, a state's judicial system "does not apply or uphold minimal constitutional due process procedures to ensure fairness" (Pl.'s Supp. Opp'n Mot. Dismiss at 9.) and "the whole state judicial process appears to have become corrupted by the highly partisan elections and the low standards the judges and justices have engaged in," (*Id.* at 19.) then the principle of comity which undergirds the *Rooker–Feldman* doctrine is absent.

That parties to a lawsuit have a right to an impartial judge is a bedrock principle of this nation's system of justice. *See Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), 520 U.S. 899, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 ("the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." (quoting *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)); *Haupt v. Dillard,* 17 F.3d 285, 287 (9th Cir.1994) ("The right to a fair trial is 'a basic requirement of due process' and includes the right to an unbiased judge." (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955))). The United States Supreme Court noted that:

The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. . . . [Neutrality] preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done,' by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the

arbiter is not predisposed to find against him.

*Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) (quoting *Joint Anti–Fascist Comm. v. McGrath,* 341 U.S. 123, 172, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). In *Marshall,* the Court noted than as far back as Chief Justice Taft's opinion in *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), the Court has protected the "right to have an impartial judge." *Id.* at 535, 47 S.Ct. 437; *see* 446 U.S. at 242–43, 100 S.Ct. 1610.

Plaintiff contends that there is a distinction "between an allegation where the state court decision itself is erroneous ... and ... where the procedure followed in state court is so defective itself that the manner in which the decision is rendered violates fundamental principles of due process, thereby rendering the state court incompetent to decide the matter." (Pl.'s Opp'n Mot. Dismiss at 14.) As the Supreme Court has made clear, such allegations do in fact give rise to a distinct due process claim.

■ As the factual allegations discussed above indicate, Dr. Dababnah believes that Judge Burnside has used, and continues to use, his judicial office and the power it has over his pending property settlement and child support matters to punish and threaten him to desist from exercising and seeking to vindicate his federally protected constitutional rights. Relying on *Nesses,* the United States District Court for the Eastern District of Pennsylvania recently found that *Rooker–Feldman* did not apply on facts similar to those alleged here. *See Spencer v. Steinman,* 968 F.Supp. 1011 (E.D.Pa.1997). In *Spencer,* the plaintiff alleged that a lawyer used his influence with a state court judge to obtain favorable rulings for his law firm. *See id.* at 1013–14. Judge Robreno found, after an extensive discussion of *Nesses,* that *Rooker–Feldman* did not bar plaintiff's § 1983 claims where he did not seek reversal of state court rulings but pointed to them

"only as evidence of the harm which the alleged conspiracy caused him ...." *Id.* at 1017. The question presented to this court is whether Dr. Dababnah has sufficiently alleged that he faced, and continues to face, such a corrupt tribunal envisioned in *Nesses* to lift the barrier *Rooker–Feldman* imposes. He urges that he has.

On March 17, 1999, plaintiff filed a "Supplemental Opposition" with this court which defendant Burnside describes as "an editorial podium on the political issue of selection of state court judges in West Virginia." (Def. Burnside's Supp.Mem. of Law at 2.) Defendant Burnside further described this filing as a "lengthy diatribe" that is "based exclusively upon unsupported allegations made in other cases ... and political commentary...." (*Id.* at 2, 4.) Judge Burnside decided that "no reply is needed or warranted regarding these extraneous allegations and ideological arguments." (*Id.* at 2.) This is unfortunate because those arguments are the basis of the plaintiff's request for a *Nesses* exception to *Rooker–Feldman.* This court is duty-bound to take such allegations seriously until the evidence indicates otherwise. The defendants and their counsel should take them seriously as well.

To be sure, Dr. Dababnah's "Supplemental Opposition" is striking. Plaintiff claims that, for purposes of a *Nesses* exception, "[i]f ever there was such a rogue state court system, it is the West Virginia state court system, administered by the West Virginia Supreme Court of Appeals." (Pl.'s Supp. Opp'n Mot. Dismiss at 9.) As part of plaintiff's attack on the highest court in the state, he repeats a quote from former West Virginia Supreme Court of Appeals Justice Richard Neely in reference to the court on which he formerly served: "If you build a brothel, you shouldn't be surprised when you come back and find it's inhabited by whores." (*Id.* (quoting Max Boot, *Out of Order* 183 (1998)).)

One of Dr. Dababnah's attacks on the justice system in West Virginia for a *Nesses* exception is the method of selecting judges. All state court judges and justices in West Virginia are selected through partisan elections.[6] Plaintiff's filing and Max Boot's book *Out of Order,* are attacks on this type of judicial system. Questionable fund raising for now-Chief Justice Larry Starcher's election campaign is discussed in Boot's book, after which the author notes the campaign's success but asks, "at what cost to the *already tattered* reputation of the bench in that state?" Boot, *supra* at 183 (emphasis added). Chief Judge Posner also discussed this problem in *Nesses:*

> [I]t is unclear, to say the least, that the U.S. Constitution can be thought to forbid the operation of politics in state judiciaries.... Most state judges are elected, some in partisan elections; the inevitable result is the injection of politics into the judicial process; no one supposes that therefore the election of judges is unconstitutional. At some point politicization of the legal process might violate a litigant's rights under the free-speech or due process clauses of the Constitution—the judge might be a political enemy of the litigant, determined to rule against him for his political views....

68 F.3d at 1004–05 (internal citations and parenthetical omitted). Just recently, two justices of the United States Supreme Court spoke out against threats to judicial neutrality. One of those threats, according to Justice Anthony M. Kennedy, is campaign spending in state judicial elections. *See* Joan Biskupic, *In Rare Appearance, 2 Justices Concur Against Threats to Neutrality,* Wash. Post, December 6, 1998, at A2, *available in* 1998 WL 22539304. Justice Kennedy made a more impassioned point summarizing his concerns: "The law makes a promise. The

promise is neutrality. If that promise is broken, the law ceases to exist. All that's left is the dictate of a tyrant, or a mob." *Id.*

Plaintiff contends that the present situation of the judiciary in West Virginia rises to the level of concern voiced by Justice Kennedy, Chief Judge Posner, and author Max Boot. Specifically, he argues that the system of partisan elections of judges creates an environment where the ability of the judiciary to protect minority rights is greatly in doubt. In West Virginia, plaintiff notes, all five justices of the Supreme Court are elected Democrats, as are the vast majority of all judges in the state. The court does not recognize the relevance of this argument in the present case. Dr. Dababnah does not claim that he can not get a fair tribunal in West Virginia because he is not a Democrat.[7] Clearly, plaintiff does not present the scenario Chief Judge Posner describes above; there is no indication that Dr. Dababnah is a "political enemy" of any of the defendants.

More important is plaintiff's argument that this system of election has produced a judiciary in West Virginia where there is no check to prevent judges and justices from ruling from a position of self-interest or bias and, as a result, that is precisely what they do. Plaintiff claims "[a]t a very minimum, there is definitely an appearance that the current justices are stooping to new lows in the gutter when it comes to standards for recusing themselves from cases." (Pl.'s Supp. Opp'n Mot. Dismiss at 9.)

Plaintiff notes the unusual situation in West Virginia where recusal is left to the unreviewable discretion of the individual justice and catalogues several incidences where currently sitting justices have refused to recuse themselves in cases where they might be perceived to be self-interest-

6. Except vacancies in unexpired terms which are filled through appointment by the Governor.

7. In fact, the court is unaware of Dr. Dababnah's party affiliation, or even if he has one.

ed. A legislative attempt in 1996 to change this arrangement and provide review by the whole court was met with a veto by Governor Caperton, allegedly following a threat by the then Chief Justice that the court would strike down the act. *See* (*id.* at 14.) Additionally, in West Virginia the court passes its own rules and controls much of its budget without oversight or approval of any other branch. *See State ex rel. Bagley v. Blankenship,* 161 W.Va. 630, 246 S.E.2d 99, syl. pt. 3, 5 (1978). West Virginia is unique in this regard.[8]

If plaintiff's allegations in the instant case are true, he faces a circuit court judge, with obvious self-interest in two cases plaintiff is pursuing in this federal court, who has control over plaintiff's domestic relations action and all that entails. The immediate effects, according to plaintiff, have been imprisonment and the loss of his medical license. On appeal, he faces a state supreme court whose justices appear to have few qualms about judges who sit .in cases with an obvious conflict of interest. If such a situation does in fact exist, the competency of the state judiciary to hear a federal constitutional claim against one of its members must be seriously questioned. Chief Judge Posner's analysis is correct; in such a situation, to bar this court's jurisdiction under *Rooker–Feldman* would run counter to the very principles upon which the doctrine is founded. However, the burden is on the plaintiff to demonstrate that this court, in fact, has jurisdiction under the *Nesses* exception. The decision of this court is merely that he should have an opportunity to so demonstrate. To date, the court finds that the material jurisdictional facts are in dispute; accordingly, the motion to dismiss must be DENIED.

### B. Younger Abstention

Judge Burnside next asks this court to refrain from exercising its jurisdiction for declaratory relief under the doctrine developed by the United States Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Defendant Burnside contends however that abstention under *Younger* is appropriate here under the three-part test approved of by the United States Court of Appeals for the Fourth Circuit: "(1) is there an ongoing state judicial proceeding; (2) do the proceedings implicate important state interests; [and] (3) is there an adequate opportunity in the state proceedings to raise federal claims." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 251 (4th Cir.1993) (quoting 797 F.Supp. 494, 497) (citations omitted).

Without question, the first two elements of the test are met. There is an ongoing proceeding in the Circuit Court of Raleigh County, West Virginia, and that case implicates the significant ·state interest in domestic relations and the integrity of its judiciary. The issue before this court is whether there is, in fact, an adequate opportunity in the state proceeding for plaintiff to raise his federal claims.

This third element of the *Younger* doctrine is closely related to the analysis under *Rooker–Feldman* discussed above and need not be extensively repeated. Plaintiff contends that being forced to raise his constitutional claims before the judge of whom he complains can not be the "adequate opportunity" envisioned by *Younger.*

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual

---

8. "Other than West Virginia's judiciary, which enjoys limited budget autonomy, state judiciaries do not have autonomy over funding...." Jeffrey Jackson, *Judicial Indepen-* dence, *Adequate Court Funding, and Inherent Judicial Powers,* 52 Md.L.Rev. 217, 250 (1993) (citing *Bagley* ).

bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Plaintiff raises constitutional claims that are separate and distinct from the underlying divorce and child support action. Those claims involve the conduct of the presiding judge and the impact of that conduct outside of the case. The allegations are extraordinary. Therefore, it is likely that, if the *Younger* doctrine were utilized and plaintiff was required to present his claims to Judge Burnside, a due process violation would result.

■ The court finds that, if the situation is as plaintiff alleges, then there is not an adequate opportunity to present his constitutional claims under the third prong of *Younger.* The court also notes that the Fourth Circuit in *Forst,* the case cited by Judge Burnside, found that even if the *Younger* test is met, "[i]n 'extraordinary circumstances,' the federal courts may disregard the 'strong federal policy against federal-court interference with pending state judicial proceedings.'" 4 F.3d at 251 (quoting *Middlesex County Ethics Comm.,* 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)). The plaintiff presents to this court extraordinary circumstances. Defendant's request that this court invoke the *Younger* doctrine will be DENIED.

### C. 42 U.S.C. § 1985(2)

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court's inquiry is limited to the motion, memoranda in support and in opposition thereto, the complaint and the answer. "[A] motion to dismiss for failure to state a claim for relief should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989) (citation omitted) (quoting *Johnson v. Mueller,* 415 F.2d 354, 355 (4th Cir.1969)). "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993) (citation omitted).

Dr. Dababnah alleges in Count 11 of his complaint that Judge Robert A. Burnside and Mr. Richard Gunnoe "conspired to threaten to injure, and injured, [plaintiff] in his property for the purpose of preventing him from attending this Court as a party in lawsuits that he has filed in this U.S. District Court," all in violation of 42 U.S.C. § 1985(2). (Pl.'s Compl. ¶ 209, at 46–47.)

Judge Burnside argues that plaintiff's Count 11 fails to state a claim upon which relief can be granted because the allegations amount to nothing more than unsupported inferences and the relief he seeks is unavailable under the statute. Specifically, Judge Burnside contends that plaintiff's allegations are "a hodgepodge of beliefs, implications and innuendo that almost entirely pre-date the federal court lawsuits." (Def.'s Supp.Mem. Law at 5.) Furthermore, 42 U.S.C. § 1985(3) permits damages, but not the declaratory and injunctive relief plaintiff requests.

*1.*

Plaintiff agrees that many of the paragraphs in Count 11 allege events that took place prior to the filing of any lawsuit in federal court. Plaintiff contends that their inclusion in Count 11 was for background and sequential order, and to demonstrate that Dr. Dababnah does in fact have valid claims pending against prosecutor Keller–Burnside in this court. Plaintiff disputes the relevancy of defendant's argument as long as the essential elements of a § 1985(2) claim are alleged. Plaintiff re-

peats paragraphs 195–97 and 205–08 of his complaint in order to establish the elements that: (1) two or more persons; (2) conspired; (3) to threaten or injure a party in his property; (4) to deter the party from attending, or on account of having attended, a court of the United States. *See* (Pl.'s Supp. Opp'n at 4–5.)

Under the standard for a motion to dismiss, the court finds that plaintiff has sufficiently alleged a violation under the first three elements for § 1985(2). Plaintiff contends that filing his complaints in federal court is equivalent to "attending" in the statute.

In a recent case from this district, Judge Copenhaver assumed, without deciding, that "attending" or "attended" could be interpreted as filing a lawsuit. *See Rhodes v. Smithers,* 939 F.Supp. 1256, 1271 (S.D.W.Va.1995). Judge Copenhaver noted the difference of opinion in the circuits on this issue. In *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981), the Fifth Circuit found that to come within the plain language of § 1985(2), a plaintiff must allege that the interference complained of was for physical presence or testifying in federal court, not for merely filing a lawsuit. *See id.* at 348. In his written dissent from the denial of the Writ of certiorari in *Kimble,* Justice White noted that, while it was not the main issue in the case, he would have preferred that the Supreme Court address the issue of what "attended" means. *Kimble,* 454 U.S. at 1113 n. 4, 102 S.Ct. 687 (White, J., dissenting). To the contrary of the Fifth Circuit's opinion in *Kimble,* four years later the Tenth Circuit came to an opposite conclusion. In *Wright v. No Skiter, Inc.,* 774 F.2d 422 (10th Cir.1985), the Tenth Circuit chose to rely on the reasoning of the Fifth Circuit panel opinion, rather than the en banc opinion, to find that "for the purposes of Section 1985(2) an individual is deemed to have 'attended' a court of the United States from the moment that the person files a complaint." *Id.* at 425 (quot-

ing original panel decision in *Kimble v. D.J. McDuffy, Inc.,* 623 F.2d 1060, 1068 (5th Cir.1980), *vacated on reh'g en banc,* 648 F.2d 340 (5th Cir.1981)). Without deciding the issue, the Ninth Circuit discussed these two cases and noted that the First Circuit decided by implication that filing a lawsuit is the same at attending for purposes of § 1985(2). *See Portman v. County of Santa Clara,* 995 F.2d 898, 910 (9th Cir.1993) (mentioning *Irizarry v. Quiros,* 722 F.2d 869, 871 (1st Cir.1983)).

Defendant Burnside does not argue that plaintiff has failed to state a cause of action under § 1985(2) because the "attended" element is not met by the mere filing of a lawsuit; the court need not address the issue, one that is woefully unclear at the circuit court of appeals level. Therefore, the motion to dismiss will be DENIED.

**2.**

Defendant Burnside claims that plaintiff erred by requesting declaratory and injunctive relief rather than asking for damages pursuant to 42 U.S.C. § 1985(3). Judge Burnside points to *Cuban v. Kapoor Bros., Inc.,* 653 F.Supp. 1025 (E.D.N.Y. 1986), where the court found that injunctive relief was inappropriate because only damages were authorized by the statute. *Id.* at 1033. Since *Cuban,* there has not been a single published case that has cited it as support for the position Judge Burnside espouses. Rather, "[t]he clear majority of decisions addressing the issue have upheld the granting of injunctive relief pursuant to § 1985(3)." *Women's Health Care Servs. v. Operation Rescue–National,* 773 F.Supp. 258, 267 (D.Kan.1991), *rev'd on other grounds,* 24 F.3d 107 (10th Cir. 1994), (citing *Action v. Gannon,* 450 F.2d 1227 (8th Cir.1971); *Mizell v. North Broward Hosp. Dist.,* 427 F.2d 468 (5th Cir. 1970); *Brewer v. Hoxie School Dist. No. 46,* 238 F.2d 91 (8th Cir.1956); *Gaulter v. Capdeboscq,* 404 F.Supp. 900 (E.D.La. 1975), *aff'd in part & rev'd in part on other grounds,* 594 F.2d 127 (5th Cir.1979); *Freeman and Bass, P.A. v. New Jersey*

*Comm'n of Investig.,* 359 F.Supp. 1053 (D.N.J.1973); *Patton v. Bennett,* 304 F.Supp. 297 (D.Tenn.1969)).

Because it is apparent that plaintiff may seek relief other than damages under § 1985(3), and, even if he may not, because plaintiff requests that the court "[g]rant such other relief as the Court may deem just and proper," defendant's motion to dismiss on Count 11 will be DENIED. (Pl.'s Compl. XXI. (15), at 60.)

### D. Declaratory Judgment Act

 Judge Burnside asks this court to exercise its discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201, and decline to hear plaintiff's claims for declaratory relief.

In this district, the recent decision of *Allstate Ins. Co. v. DiGiorgi,* 991 F.Supp. 767 (S.D.W.Va.1998), detailed the Fourth Circuit's framework for the court's exercise of discretion under the Declaratory Judgment Act:

First, a district court must consider the *Quarles* [*Aetna Cas. & Sur. Co. v. Quarles,* 92 F.2d 321 (4th Cir.1937)] criteria of whether the federal action

(i) " 'will serve a useful purpose in clarifying and settling the legal relations in issue,' " and

(ii) " 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' "

*Gatewood Lumber, Inc. v. Travelers Indemnity Co.,* 898 F.Supp. 364, 367 (S.D.W.Va.1995) (Haden, C.J.) (quoting *Continental Cas. Co. v. Fuscardo,* 35 F.3d 963, 965 (4th Cir.1994)) (citations omitted). If the first set of criteria are met, the district court next considers the criteria enumerated in *Nautilus Insurance Co. v. Winchester Homes, Inc.,* 15 F.3d 371, 377 (4th Cir.1994). This four-factor test is stated as:

1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in state court; 2) whether the issues raised in the federal action can be more efficiently resolved in the pending state action; 3) whether the federal action would result in unnecessary entanglement between the federal and state systems due to overlapping issues of fact or law; 4) whether the federal action is being used merely as a device for "procedural fencing," i.e., to provide another forum in a race for res judicata.

*Id.*

*Id.* at 768–69. In his motion to dismiss, defendant Burnside does not ask this court to examine the initial *Quarles* factors, therefore, the court will analyze this case under the four-part *Nautilus* test.

There is no question that the state has a strong interest in the underlying divorce and child support proceeding. That, of course, is not what is at issue here. Plaintiff's claims against Judge Burnside are for violations of his constitutional rights of due process, free speech and access to the courts. The state has no greater interest in deciding these specific declaratory claims than does a federal district court. Second, there is a serious question whether these constitutional claims can be efficiently decided in the state court action. At issue are the actions of the presiding judge. In addition, the state court proceedings to date have exclusively addressed the state issues of marital property and child support and as yet are untainted with these constitutional claims. Therefore, it may in fact be more efficient for a federal court to decide these claims while the important state matters proceed in the circuit court. Third, while the claims in the two courts are distinct, there certainly will be overlapping issues of fact, and likely overlapping issues of law between them. However, the claims between the two cases are quite distinct and therefore the overlap will be minimal. Finally, defendant claims that this case is procedural fencing to get these claims out of the state court where they belong and into federal court. However, if plaintiff's

claims are true that Judge Burnside has conspired against him to violate his constitutional rights, and that relief in the state judicial system is impossible because it is a corrupt system, then this factor must weigh in plaintiff's favor.

■ As defendant Burnside admits, this court's discretion over whether to hear declaratory judgment actions should be exercised liberally in favor of hearing them. *See American Nat'l Property and Cas. Co. v. Weese,* 863 F.Supp. 297, 299 (S.D.W.Va. 1994). Seeing no reason to depart from this direction, the court will DENY defendant's motion.

### CONCLUSION

For the reasons stated above, the court will deny defendant's motions to dismiss.

A separate Order of even date herewith will be entered implementing the rulings contained in this Memorandum Opinion.